UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZIBA YOUSSOFI,<br><br>                          Plaintiff,<br><br>v.<br><br>CREDIT ONE FINANCIAL, and DOES 1 through 10,<br><br>                          Defendant. | Case No.: 15-CV-1764-AJB-RBB<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO STAY CASE AND COMPEL ARBITRATION**<br><br>(Doc. No. 10) |

Presently before the Court is Defendant Credit One Financial's ("Defendant") motion to stay case and compel arbitration. (Doc. No. 10.) Plaintiff Ziba Youssofi ("Plaintiff") opposes the motion. (Doc. No. 13.) The Court finds the matter suitable for decision on the papers, without oral argument, pursuant to Local Civil Rule 7.1.d.1. For the reasons set forth below, the Court **GRANTS** Defendant's motion.

## <u>BACKGROUND</u>

In 2015, Plaintiff alleges Defendant "constantly and continuously" placed collection calls to her cellular telephone in an attempt to collect an alleged debt arising from a consumer credit card she opened with Defendant. (Doc. No. 1 ¶¶ 11–12.) Plaintiff alleges Defendant placed these calls using an automatic telephone dialing system ("ATDS") or with an artificial or prerecorded voice. (*Id.* ¶ 15.)

Plaintiff alleges on or about May 1, 2015, Defendant called her cellular telephone, and she spoke with a female representative. (*Id.* ¶ 16.) Plaintiff alleges she requested that Defendant cease placing collection calls to her cellular telephone at that time. (*Id.* ¶ 16.) Plaintiff alleges that despite this request, Defendant continued to call her. (*Id.* ¶ 18.) Plaintiff alleges she reiterated her request that Defendant stop placing collection calls to her cellular telephone on May 19, 2015, when she spoke with an unidentified male representative of Defendant. (*Id.* ¶ 19.) However, Defendant continued to call. (*Id.* ¶ 21.) Plaintiff approximates that Defendant placed more than 200 telephone calls to her cellular telephone using an ATDS or an artificial or prerecorded voice after she revoked her consent. (*Id.* ¶ 22.)

On August 10, 2015, Plaintiff filed a complaint against Defendant, asserting violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788. (Doc. No. 1.) Defendant answered Plaintiff's complaint on November 16, 2015. (Doc. No. 5.) Defendant filed the instant motion to stay case and compel arbitration on January 4, 2016. (Doc. No. 10.) Plaintiff filed an opposition to Defendant's motion, (Doc. No. 13), and Defendant replied, (Doc. No. 15). Finding the parties' briefing on Plaintiff's constitutional challenges to the Federal Arbitration Act ("FAA") insufficient, the Court ordered supplemental briefing on this issue on March 8, 2016. (Doc. No. 18.) The parties, as well as the United States, filed such briefing. (Doc. Nos. 21, 22, 24.)

## LEGAL STANDARD

The FAA governs the enforcement of arbitration agreements involving interstate commerce. 9 U.S.C. § 2. Pursuant to § 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in [the] agreement." *Id.* § 4.

Given the liberal federal policy favoring arbitration, the FAA "mandates that district courts *shall* direct parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Thus, in a motion to compel arbitration, the district court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank Nat'l Ass'n*, 673 F.3d 947, 955–56 (9th Cir. 2012) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). If these factors are met, the court must enforce the arbitration agreement in accordance with its precise terms. *See id.*

While generally applicable defenses to contract, such as fraud, duress, or unconscionability, may invalidate arbitration agreements, the FAA preempts state law defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 338–39 (2011). Because of the strong policy favoring arbitration, any doubts are to be resolved in favor of the party moving to compel arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## DISCUSSION

Defendant moves the Court to compel arbitration and stay these proceedings pursuant to the FAA. (Doc. No. 10 at 6.) Defendant argues that at the time it sent Plaintiff the credit card at issue in this litigation, it included a cardholder agreement, disclosure statement, and arbitration agreement ("Arbitration Agreement" or "Agreement") (collectively, "Cardholder Agreement"). (*Id.* at 6–7; Doc. No. 10–1 ¶ 6.) The Cardholder Agreement states, in pertinent part, the following:

> This Agreement, together with the application you previously signed and the enclosed Arbitration Agreement, governs the use of your VISA® or MasterCard® Account issued by Credit One Bank, N.A. (the "Account," "Card" or "Card Account"). . . . By requesting and receiving, signing or using your card, you agree as follows: . . .

**29. GOVERNING LAW:** This Agreement is governed by and interpreted in accordance with the laws applicable to national banks, and, where no such laws apply, by the laws of the State of Nevada, excluding the conflicts of law provisions thereof, regardless of your state of residence.

**30. ARBITRATION AGREEMENT:** The Arbitration Agreement provided to you with this Agreement governs the enforcement by you and us of your and our legal rights under this Agreement.

(Doc. No. 14-2 at 3, 5.) The Arbitration Agreement in turn provides the following:

<u>ARBITRATION</u>

**PLEASE READ THIS PROVISION OF YOUR CARD AGREEMENT CAREFULLY. IT PROVIDES THAT EITHER YOU OR WE CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT. IN ARBITRATION, YOU MAY CHOOSE TO HAVE A HEARING AND BE REPRESENTED BY COUNSEL.**

*Agreement to Arbitrate:* You and we agree that either you or we may, without the other's consent, require that any controversy or dispute between you and us (all of which are called "claims"), be submitted to mandatory, binding arbitration. . . .

*Claims Covered:* Claims subject to arbitration include, but are not limited to, disputes relating to the establishment, terms, treatment, operation, handling limitations on or termination of your account; any disclosures or other documents or communications relating to your account; . . . billing, billing errors, credit reporting, the posting of transactions, payment or credits, or collections, matters relating to your account; [and] . . . the application, enforceability or interpretation of this Agreement, including this arbitration provision . . . . Any questions about what Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way

4

the law will allow it to be enforced.

**_Procedures and Law Applicable in Arbitration:_** . . . The arbitration will be conducted under the applicable procedures and rules of the arbitration administrator that are in effect on the date the arbitration is filed . . . . The arbitrator will have the power to award to a party any damages or other relief provided for under applicable law . . . .

**_Enforceability, Finality, Appeals:_** You or we may bring an action, including a summary or expedited motion, to compel arbitration of Claims subject to arbitration, or to stay the litigation of any Claims pending arbitration, in any court having jurisdiction. Such action may be brought at any time, even if any such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered.

(*Id.* at 6–7.) Defendant argues Plaintiff's claims fall within the scope of the Arbitration Agreement, and, accordingly, its motion must be granted. (Doc. No. 10 at 14–16.)

As an initial the matter, the Court notes Plaintiff does not dispute that the Arbitration Agreement encompasses the claims pled in her complaint. Nor can she. As just stated, the Agreement covers a broad range of disputes, including "*communications* relating to your account" and "billing, billing errors, credit reporting, the posting of transactions, payment or credits, or *collections*, matters relating to your account[.]" (Doc. No. 14-2 at 6 (emphasis added)). Because "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses*, 460 U.S. at 24–25, the Court finds Plaintiff's claims fall within the Agreement's scope. Accordingly, the central question before the Court under *Kilgore* is whether the Agreement is valid. Plaintiff sets forth three arguments she contends render the Arbitration Agreement invalid: (1) the FAA is unconstitutional under the First and Seventh Amendments of the United States Constitution; (2) there was no valid agreement to arbitrate; and (3) even assuming there was a valid agreement, the agreement is both procedurally and substantively unconscionable. (Doc. No. 13.) The Court will consider each of Plaintiff's arguments in turn.

1    *I.     The Constitutionality of the Federal Arbitration Act*

2        Plaintiff first argues the FAA is unconstitutional for violating the Petition Clause

3    of the First Amendment and the right to a jury trial contained in the Seventh Amendment.

4    (Doc. No. 13 at 10–18; Doc. No. 24 at 2.) The Petition Clause provides that "Congress

5    shall make no law . . . abridging . . . the right of the people . . . to petition the government

6    for a redress of grievances." U.S. Const. amend. I; *BE & K Constr. Co. v. N.L.R.B.*, 536

7    U.S. 516, 524 (2002). The Seventh Amendment guarantees the right to a jury trial in all

8    civil cases at common law where the value in controversy exceeds twenty dollars. U.S.

9    Const. amend. VII.

10       The essence of Plaintiff's position is that the FAA works to prevent her from

11   seeking redress in a public forum and from having her claims heard by a jury. (*See* Doc.

12   No. 13 at 12, 17–18.) She argues Congress's passage of the FAA has effectively waived

13   her constitutional rights, but that her alleged waiver does not meet the factors consistently

14   used by courts to determine whether a waiver is knowing, voluntary, and intelligent. (*Id.*

15   at 13–16.) *See Travelers Cas. & Sur. Co. v. Highland P'ship, Inc.*, No 10CV2503 AJB

16   (DHB), 2013 WL 878754, at *2 (S.D. Cal. Mar. 8, 2013) (listing the following factors as

17   relevant to the constitutional waiver determination: (1) whether there was a gross

18   disparity in bargaining power between the parties; (2) the business or professional

19   experience of the party opposing the waiver; (3) whether the opposing party had an

20   opportunity to negotiate the contract terms; and (4) whether the clause containing the

21   waiver was inconspicuous).

22       Defendant counters, arguing that the FAA does not violate Plaintiff's constitutional

23   rights. (Doc. No. 22 at 2.) Specifically, Defendant asserts that Plaintiff's First

24   Amendment right to petition the Court is not violated because she has failed to allege

25   state action. (*Id.* at 2–3.) Defendant further argues that the Seventh Amendment does not

26   preclude waiver of the right to a jury trial for consumer-related statutory claims. (*Id.* at 4.)

27   Meanwhile, the United States asserts that Plaintiff's constitutional challenges are more

28   appropriately addressed as a constitutional waiver issue; as such, the Court need not

decide whether the FAA violates the Constitution. (Doc. No. 21 at 2.)

The Court agrees with the United States. "The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC*, 563 U.S. at 339. The FAA's most fundamental principal is to view arbitration as a matter of contract. *Id.* (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). In view of this principal and the liberal federal policy favoring arbitration, federal courts are required to give arbitration agreements equal footing with other contract agreements. *Id.*; *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

The FAA provides a mechanism for the enforcement of contract agreements entered into by parties, *United States v. Park Place Assocs.*, 563 F.3d 907, 932 (9th Cir. 2009), thus ensuring private arbitration agreements would be enforced according to their terms, *AT&T Mobility LLC*, 563 U.S. at 344 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)); *see Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 932 (9th Cir. 2013). Courts, when enforcing arbitration agreements, must "give effect to the [parties'] contractual rights and expectations." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting *Volt*, 489 U.S. at 479). When dealing with issues involving private arbitration agreements, the parties' intentions control and should be enforced accordingly. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Plaintiff argues that the FAA violates the Petition Clause and the Seventh Amendment's right to a jury trial by forcing her to give up these rights. (Doc. No. 13 at 12–17.) The FAA's function, however, is to enforce arbitration agreements previously entered into by private parties. As discussed below, such an agreement exists in this case. *See infra* Discussion Section II. Because the FAA functions only as an enforcement mechanism and thus does not act absent a privately agreed-upon arbitration agreement, the Court finds that Plaintiff's constitutional challenges are merely a constitutional waiver argument in disguise. As such, the Court concludes it need not reach the merits of Plaintiff's constitutional challenges. This conclusion is supported by the fact that the bulk

of Plaintiff's constitutional arguments concern whether her alleged waiver meets the four-factor constitutional waiver test. (Doc. No. 13 at 13–18; Doc. No. 24 at 6–11.) This conclusion is furthered supported by the fact that the Court is to "consider non-constitutional grounds for decision" prior to addressing constitutional questions, *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981), and should not "lightly impute to Congress an intent to invade the[] freedoms . . . protected by the Bill of Rights," *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961).

Turning to Plaintiff's waiver argument, she argues she did not knowingly, intelligently, and voluntarily waive her First and Seventh Amendment rights. (Doc. No. 13 at 13–15, 18.) Even when viewed as a constitutional waiver argument, however, the Court finds it need not apply this four-factor test. First, application of the test would run contrary to the liberal federal policy favoring arbitration. *AT&T Mobility LLC*, 563 U.S. at 339. Second, controlling Ninth Circuit makes clear that the waiver test "is simply beside the point" in the context of a dispute surrounding an arbitration agreement. *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir.1988), *overruled on other grounds by Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931 (9th Cir. 2001).

In *Cohen*, the plaintiffs sought to avoid enforcement of the arbitration agreement they entered into by arguing they were fraudulently induced to enter the agreement by the defendant's "failure to disclose the effects of the arbitration clause and by the advice of [the defendant's] agent that the [contract] would 'not compromise any of [their] rights.'" *Id.* at 286. The Ninth Circuit easily rejected this position:

> We know of no case holding that parties dealing at arm's length have a duty to explain to each other the terms of a written contract. We decline to impose such an obligation where the language of the contract clearly and explicitly provides for arbitration of disputes arising out of the contractual relationship.

*Id.* at 287; *see also Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir. 1984) ("[T]hough *perhaps* not contemplated by the [plaintiffs] when they signed the contract, loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate. The [plaintiffs] cannot use their failure to inquire about the

ramifications of that clause to avoid the consequences of agreed-to arbitration." (emphasis in original)).

Like the parties in *Cohen*, Plaintiff here cannot seek to upend the Arbitration Agreement by arguing she did not validly waive her constitutional rights when applying for and using the credit card. This is particularly true where the Arbitration Agreement, in bold and unequivocal terms, informs her that entering into the Agreement will result in waiver of certain constitutional rights:

> **PLEASE READ THIS PROVISION OF YOUR CARD AGREEMENT CAREFULLY. IT PROVIDES THAT EITHER YOU OR WE CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY.**

(Doc. No. 14-2 at 7.) There is no unfairness in holding Plaintiff to the clear terms of the written contract to which she agreed. *See Cohen*, 841 F.2d at 287–88 ("We see no unfairness in expecting parties to read contracts before they sign them. . . . This [] is particularly persuasive in the context of arbitration clauses, where permitting plaintiffs to present their claims to a jury trial would frustrate the very policies these clauses, and the [FAA] itself, are meant to promote.").[1] *See generally Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1122 (9th Cir. 2008) (finding that if a party fails to read a contract but manifests assent, that party may not later rescind the agreement on the basis that he did not read the terms of the agreement).

For all these reasons, the Court rejects Plaintiff's contentions that the FAA is unconstitutional and that she did not validly waive her constitutional rights.

---

[1] To the extent Plaintiff argues the Agreement acts as a modification to the application she submitted for the credit card, the Court rejects this contention. *See infra* Discussion Section II.B.2.

## II.    The Validity of the Arbitration Agreement

Plaintiff next argues the parties never entered into a valid agreement to arbitrate her claims. (Doc. No. 13 at 18–19.) Defendant counters that (1) a valid agreement to arbitrate exists, and (2) the Agreement delegates any questions regarding its validity to the arbitrator. (Doc. No. 15 at 4–7.)

Under the FAA, the Court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."[2] *Chiron Corp.*, 207 F.3d at 1130. Generally, courts should apply state law principles governing the formation of contracts when determining whether the parties have agreed to arbitrate. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Where the Court is determining whether parties have agreed to arbitrate certain matters, however, it "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)).

### A.    Whether California or Nevada Law Applies

As an initial matter, the parties dispute whether California or Nevada law governs the Arbitration Agreement. The Cardholder Agreement provides that "[t]his Agreement is governed by and interpreted in accordance with the laws applicable to national banks, and, where no such laws apply, by the laws of the State of Nevada, excluding the conflicts of law provisions thereof, regardless of your state of residence." (Doc. No. 14-2 at 5.) Defendant contends the inclusion of this governing law provision is appropriate and, accordingly, Nevada law should apply because (1) Nevada is the state where Defendant is headquartered, and (2) entering into contracts nationwide is a reasonable basis for designating the application of a specific state's law. (Doc. No. 15 at 3.) Plaintiff counters that California law should apply because the governing law provision is invalid given that she has no relationship to Nevada and most, if not all, of the transactions

---

[2] As noted previously, only the first prong of this inquiry is at issue here.

occurred in California. (Doc. No. 13 at 20–21.) Plaintiff also argues California has a greater interest in applying its unconscionability principles than Nevada. (*Id.* at 21.)

"Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply. It makes this determination using the choice-of-law rules of the forum state[.]" *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010). In California, "courts apply the parties' choice of law unless the analytical approach articulated in [section] 187(2) of the Restatement (Second) of Conflict of Laws . . . dictates a different result." *Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1193 (S.D. Cal. 2013) (quoting *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010)). Under this approach, the court must first determine "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Wash. Mut. Bank, FA v. Superior Cour*t, 24 Cal. 4th 906, 916 (2001) (quoting *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466 (1992)). If either test is met, the court must then determine "whether the chosen state's law is contrary to a *fundamental policy* of California. If there is no such conflict, the court shall enforce the parties' choice of law." *Id.* (quoting *Nedlloyd*, 3 Cal. 4th at 466) (emphasis in original).

Here, the parties specifically agreed that disputes arising from Plaintiff's use of the credit card would be governed by the laws of Nevada. (Doc. No. 14-2 at 5.) Further, as Defendant is headquartered in Nevada, (*see* Doc. No. 15 at 3), Nevada has a substantial relationship with Defendant, justifying the choice of Nevada law. *See Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1195 (N.D. Cal. 2012) (stating "a substantial relationship is present when one of the parties is domiciled in the chosen state" and finding choice of South Dakota law justified because the state had a substantial relationship with defendant, which was located in South Dakota (citing *Nedlloyd Lines B.V.*, 3 Cal. 4th at 467)). Although Plaintiff points to her lack of a relationship with Nevada as a basis for finding the first test not met, (Doc. No. 13 at 21), she cites no

authority supporting her position that *both* parties must have a substantial relationship with the chosen state. Rather, Plaintiff's position appears to run contrary to California law, which states "the parties to a contract have a substantial relationship with the chosen state *if one or more of them is incorporated there.*" *Hambrecht & Quist Venture Partners v. Am. Med. Intranet, Inc.*, 38 Cal. App. 4th 1532, 1545–46 (1995) (emphasis added).

Alternatively, the Court finds that Defendant has satisfied the second test by showing a reasonable basis for the choice of Nevada law. First, "[i]f one of the parties resides in the chosen state, the parties have a reasonable basis for their choice." *Consul, Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1147 (9th Cir. 1986). As just discussed, Defendant is headquartered in Nevada. (Doc. No. 15 at 3.) Second, as a bank that does business nationally, it is reasonable for Defendant to designate a single state's laws to control all of its credit card contracts. *See Cayanan*, 928 F. Supp. 2d at 1194–95 (finding "a reasonable basis exist[ed] for Citibank's designation of Nevada law in its arbitration agreement with McKay" because "Citibank maintains a wide reach across the United States based on the large number of student loan transactions the company has entered in the past"). The Court therefore finds that Defendant has satisfied the first step of California's choice-of-law inquiry.

Plaintiff argues that even if the first step is met, the Court should nonetheless decline to enforce the governing law provision because "California has a greater interest in applying unconscionability than Nevada." (Doc. No. 13 at 21.) Defendant counters that "Plaintiff does not identify a policy conflict sufficient to justify the application of California law . . . ." (Doc. No. 15 at 3.) Again, the Court agrees with Defendant.

Plaintiff does not identify the doctrine of unconscionability as a *fundamental* policy concern of the state of California, arguing only that California has a "greater interest" in applying the doctrine than Nevada. (Doc. No. 13 at 21.) The Court need not determine here whether unconscionability is such a policy because, as Plaintiff concedes, "both states require that the contract [be] procedurally as well as substantively unconscionable." (*Id.* at 21–22.) *See also Burch v. Second Judicial Dist. Court*, 49 P.3d

647, 650 (Nev. 2002) ("both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a contract or clause as unconscionable") (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113–14 (2000))). Where the states' laws are consistent, it necessarily follows that there is no conflict.[3]

In sum, the Court finds that (1) Nevada has a substantial relationship to Defendant, and there is a reasonable basis for the parties' choice of Nevada law; and (2) Nevada's laws are not contrary to a fundamental policy of California. Accordingly, the governing law provision contained in the Cardholder Agreement is valid, and Nevada law applies.

### B.   Whether the Arbitration Agreement is Valid

Plaintiff makes many arguments that go to the question of the Arbitration Agreement's validity: (1) Defendant has failed to prove the Agreement's existence, (Doc. No. 13 at 19); (2) Plaintiff did not mutually assent to the Agreement, (*id.*); and (3) the Agreement is unconscionable, (*id.* at 20–32). Defendant counters that (1) it has carried its burden of proving the Agreement's existence, (Doc. No. 15 at 4–5); (2) the question of the Agreement's validity is properly delegated under the Agreement to the arbitrator, (*id.* at 4); and (3) the Agreement is not unconscionable, (*id.* at 7–10).

### 1.   Whether Defendant has Proven the Agreement's Existence

Defendant asserts that it has proven the existence of the Arbitration Agreement by providing a copy of the Cardholder Agreement, which contains the Arbitration Agreement, and a declaration from its representative stating the Cardholder Agreement was sent to Plaintiff in the same envelope as the credit card she acknowledges she used. (*See* Doc. No. 13 at 9; Doc. No. 10-1 ¶¶ 7–8; Doc. No. 15 at 5.) Contrarily, Plaintiff

---

[3] While Plaintiff argues the doctrine of unconscionability is not applied as broadly under Nevada law in light of the doctrine not extending to adhesion contracts in the employment context, (*see id.* (citing *Kindred v. Second Judicial Dist.*, 996 P.2d 903, 907 (Nev. 2000)), the Court is at a loss as to how this is relevant to the instant case, which involves a consumer credit card.

1   claims that Defendant has failed to prove the Agreement's existence because (1) she had

2   no knowledge that her disputes would be subject to arbitration; (2) Defendant has not

3   provided evidence demonstrating that she knew of the Arbitration Agreement or that her

4   claims were subject to arbitration; and (3) Defendant has not provided any proof, other

5   than a conclusory declaration from its representative, that the Agreement was actually

6   mailed to Plaintiff and that she actually received it. (Doc. No. 13 at 19.)

7        The party seeking to compel arbitration "has the burden of proving the existence of

8   an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM*

9   *Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also D.R. Horton, Inc. v. Green*, 96

10  P.3d 1159, 1162 (Nev. 2004) (moving party "has the burden of persuading the district

11  court that the [arbitration] clause is valid"). "The burden of showing something by a

12  'preponderance of the evidence' . . . simply requires the trier of fact to believe that the

13  existence of a fact is more probable than its nonexistence before [he] may find in favor of

14  the party who has the burden to persuade the [judge] of the fact's existence." *Concrete*

15  *Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (citation and

16  internal quotation marks omitted). "In other words, the preponderance standard goes to

17  how convincing the evidence in favor of a fact must be in comparison with the evidence

18  against it before that fact may be found, but does not determine what facts must be

19  proven as a substantive part of a claim or defense." *Metro. Stevedore Co. v. Rambo*, 521

20  U.S. 121, 137 n.9 (1997).

21       Here, Defendant provided a copy of the Cardholder Agreement, (Doc. No. 14-2),

22  and a declaration from Vicki Scott, Defendant's Vice President of Collections, which

23  states she is familiar with Defendant's ordinary business practices and that a copy of

24  Defendant's Cardholder Agreement was sent to Plaintiff in the same envelope as the

25  credit card.[4] (Doc. No. 10-1 ¶¶ 3, 6). Plaintiff attempts to repudiate Defendant's evidence

26

27  ───────────────

28  [4] Plaintiff objects to paragraph 6 of Scott's declaration on hearsay grounds and because
    she claims it lacks foundation, is not based on personal knowledge, and is conclusory and

by submitting a declaration in which she attests she was never informed she would be required to arbitrate her disputes, she was not provided with an agreement to arbitrate, and she does not remember receiving such an agreement. (Doc. No. 13-1 ¶¶ 6–7.) On balance, the Court finds Defendant, in providing its declaration and a copy of the Cardholder Agreement, has carried its burden of proving Plaintiff's receipt of the Agreement. *See* Fed. R. Evid. 901(a), (b)(1) (stating the testimony of a witness with personal knowledge may be "sufficient to support a finding that the item is what the proponent claims it is"); *see also Krulee v. Receivables Performance Mgmt., LLC*, No. 5:14-cv-02860-RMW, 2015 WL 3638546, at *4–5 (N.D. Cal. June 11, 2015) (finding plaintiff entered into an agreement to arbitrate because the declaration of defendant's representative was sufficient to authenticate the card's terms and conditions where the representative testified "based on his 'personal knowledge' of [the company's] operations, as well as records . . . kept in the ordinary course of business"). Like the district court in *Krulee*, the Court finds Defendant here carried its burden of proving the Cardholder Agreement's existence.

//

---

speculative. (Doc. No. 13-2.) However, as Defendant's Vice President of Collections, Scott has access to Defendant's books and records as they relate to Defendant's general cardholder solicitations, cardholder agreements, and cardholder account records. She asserts these records are maintained in the ordinary course of business. In addition, she reviewed and gained knowledge of Defendant's records of Plaintiff's account. As Scott's declaration is based on her review of records maintained by Defendant in the ordinary course of business, the requirements of Federal Rule of Evidence 803(6) are met, and Plaintiff's hearsay objection is **OVERRULED**. Plaintiff's objection based on lack of personal knowledge, as well as her objection that the declaration is conclusory and speculative, are also **OVERRULED**. Scott is competent to speak on the account records based on her experience, position with Defendant, access to books and records, and personal knowledge based on her review of Plaintiff's account with Defendant. *See United States v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977) (finding an employee familiar with "normal company procedures . . . had ample personal knowledge to testify on that subject"). Her declaration sets forth this information, albeit in a concise manner.

1

2.      **Whether Plaintiff Mutually Assented to the Agreement**

2          Plaintiff next argues that even if Defendant has met its burden of proving the

3   Agreement's existence, Plaintiff cannot be bound by its terms absent her mutual assent.

4   (Doc. No. 13 at 19.) Defendant responds that Plaintiff's continued use of the credit card

5   over time constituted her mutual assent to the Cardholder and Arbitration Agreements.

6   (Doc. No. 15 at 5–7.)

7          Under Nevada law, mutual assent is necessary in order for a contract to be validly

8   formed. *See May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005) ("Basic contract

9   principles require, for an enforceable contract, an offer and acceptance, meeting of the

10  minds, and consideration."); *Roth v. Scott*, 921 P.2d 1262, 1265 (Nev. 1996) ("all

11  contracts require mutual assent, agreement, or meeting of the minds to all essential

12  elements" (citing *Keddie v. Beneficial Ins., Inc.*, 580 P.2d 955, 956 (Nev. 1978)

13  (Mowbray, J., concurring))). However, parties do not have to explicitly agree to the terms

14  of the contract; their assent "may be implied through action or inaction[.]" *Knutson*, 771

15  F.3d at 565 (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991)).

16         Here, the Court finds that Plaintiff assented to the Cardholder Agreement's terms.

17  As discussed above, Defendant has proffered sufficient evidence to prove Plaintiff was

18  mailed a copy of the Agreement with the credit card. *See supra* Discussion Section II.B.1.

19  The Cardholder Agreement stated that it, "together with the application [Plaintiff]

20  previously signed and the enclosed Arbitration Agreement, governs, the use of [her card].

21  . . . By requesting and receiving, signing, or using your card, you agree as follows." (Doc.

22  No. 14-2 at 3.)

23         Plaintiff does not dispute she began to use the card shortly after receiving it,

24  continued to use it, and complied with the other terms of the Cardholder Agreement. (*See*

25  Doc. No. 13; Doc. No. 10-1 ¶¶ 7–8; Doc. No. 15 at 6–7.) Given that the Cardholder

26  Agreement itself provided that use of the card constitutes assent to the Agreement, the

27  Court finds Plaintiff mutually assented to it. *See Bischoff v. DirecTV, Inc.*, 180 F. Supp.

28  2d 1097, 1103–1106 (C.D. Cal. 2002) (finding plaintiffs assented to customer

agreement's terms by continuing to use defendant's services after receiving the agreement in the mail, despite the service having already been activated prior to receiving the agreement). Based on the foregoing, the Court finds Defendant has carried its burden of proving Plaintiff assented to the Cardholder Agreement's terms, including the Arbitration Agreement.

Plaintiff relies on *Martin v. Wells Fargo Bank, N.A.*, No. C 12-06030 SI, 2013 WL 6236762 (N.D. Cal. Dec. 2, 2013), for the proposition that the Cardholder Agreement should be considered a modification. However, the facts of *Martin* are easily distinguishable. The initial agreement in that case did not include an arbitration agreement, nor did it mention the possibility that one could be added at a later date. *See id.* at *1–2. The defendant unsuccessfully attempted to argue that the parties entered into an arbitration agreement by way of an amendment that was included in a billing insert nearly twenty-five years later. *Id.* at *2. Additionally, the defendant only provided a declaration that the plaintiff was on a list targeted to receive the mailing insert and had the ability to see a message upon logging into her online account, but "stop[ped] short of making a definitive statement [that] the insert was . . . mailed." *Id.* at *3. By contrast, Defendant here asserts the parties did not enter into an agreement until Plaintiff received the Cardholder Agreement and began using her credit card. (Doc. No. 15 at 7.) Additionally, Defendant proffered a declaration that the Arbitration Agreement was actually mailed to Plaintiff in the same envelope as her credit card. (Doc. No. 10-1 at ¶ 6.) Consequently, the Court finds *Martin* to be inapposite and the Arbitration Agreement to be valid. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) (holding arbitration agreement valid where consumers received the agreement in the mail at the same time as the computer they ordered and then failed to return the computer within thirty days); *Bischoff*, 180 F. Supp. 2d at 1103–06 (holding arbitration agreement valid where customers received the agreement in the mail with their first billing statement, which was received after purchasing and activating service).

//

### 3.       Whether the Agreement is Unconscionable

Plaintiff's final argument against the Arbitration Agreement is that it is both procedurally and substantively unconscionable. (Doc. No. 13 at 22–32.) Predictably, Defendant argues the contrary. (Doc. No. 15 at 7–10.)

Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent–A–Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 68–70 (2010). "Because such issues would otherwise fall within the province of judicial review, we apply a more rigorous standard in determining whether the parties have agreed to arbitrate the question of arbitrability." *Momot v. Mastro,* 652 F.3d 982, 987 (9th Cir. 2011). Thus, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc.*, 475 U.S. at 649. However, where the party opposing arbitration challenges the validity of the arbitration agreement as a whole, as opposed to a specific provision contained in the agreement, courts "must treat [the arbitration agreement] as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole for the arbitrator." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 72.

Plaintiff's final assertion against the Arbitration Agreement's enforcement is that it is both procedurally and substantively unconscionable. (Doc. No. 13 at 22–32.) Essentially, she asks the Court to reach a gateway question of arbitrability. Under the circumstances of this case, the Court finds that it cannot because the parties clearly and unmistakably agreed to arbitrate this threshold issue. The Agreement's "delegation provision" states the "[c]laims subject to arbitration include, but are not limited to . . . the application, enforceability or interpretation of this Agreement, including this arbitration provision[.]" (Doc. No. 14-2 at 6.) The Ninth Circuit in *Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011), was faced with nearly identical language. The delegation provision at issue in *Momot* stated, "If a dispute arises out of or relates to this Agreement or the

validity or application of any of the provisions of th[e arbitration section], . . . the dispute shall be resolved exclusively by binding arbitration." *Id.* at 988. The Ninth Circuit easily found this language to "clearly and unmistakably indicate[] their intent for the arbitrators to decide the threshold question of arbitrability[.]" *Id.* Like the delegation provision in *Momot*, the Court finds the delegation provision here clearly and unmistakably demonstrates the parties' agreement to delegate to the arbitrator questions concerning "the application, enforceability or interpretation of th[e] Agreement[.]" (Doc. No. 14-2 at 6.)

But that conclusion does not end the inquiry. The Supreme Court recently clarified that a party opposing arbitration can raise two types of validity challenges: "'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70 (quoting *Buckeye*, 546 U.S. at 444). If the opponent challenges the specific provision to arbitrate, such a challenge may appropriately be considered by the district court. *Id.* If, however, the opponent challenges the agreement in its entirety, *Rent-A-Center* makes clear that such a challenge "does not prevent a court from enforcing [the] specific agreement to arbitrate." *Id.* Rather, the Court "must treat [the agreement] as valid[,] . . . leaving any challenge to the validity of the [a]greement as a whole for the arbitrator." *Id.* at 73.

Reviewing Plaintiff's unconscionability arguments, it is clear to the Court that she challenges the entire Arbitration Agreement as a whole, not simply the specific delegation provision. *See id.* at 71–72 (noting that the underlying contract at issue was "itself an arbitration agreement," which did not affect the Court's analysis). Plaintiff argues the Agreement is procedurally unconscionable because the entire contract is a contract of adhesion, the applicable arbitration rules were not provided, she was never provided with the Agreement, the Agreement was not properly disclosed, and she did not

1    have an opportunity to opt out of arbitration. (Doc. No. 13 at 22–25.) However, these

2    arguments relate to the Arbitration Agreement as a whole and make no mention of the

3    delegation provision specifically.

4        Plaintiff further argues the Agreement is substantively unconscionable because it

5    contains a fee-splitting provision and limits discovery. (*Id.* at 26–30.) *See Rent-A-Ctr.,*

6    *W., Inc.*, 561 U.S. at 72–73 (stating the district court correctly concluded opponent

7    challenged only the validity of the agreement as a whole in part because he argued that

8    the limits placed on discovery rendered the entire agreement substantively

9    unconscionable). While she quotes the scope of the delegation provision in full, she does

10   not argue that the specific delegation of the threshold issue of enforceability is

11   substantively unconscionable. (Doc. No. 13 at 30–32.) Rather, she uses the delegation

12   provision's coverage as an example of how the Agreement is beneficial to Defendant, but

13   detrimental to her, in that it covers only claims that a consumer would bring. (*Id.* at 30

14   ("Clearly, by looking at these provisions, the only claims that are really subject to

15   arbitration are claims a consumer, like Plaintiff, would bring against [] Defendant. For

16   example, why would Defendant bring a claim against [] Plaintiff for billing errors? Or for

17   advertising or promotions? Or for credit reporting errors? These claims are usually

18   brought by a consumer, not a bank.").) However, the Supreme Court found a nearly

19   identical argument to support the district court's conclusion that the opponent challenged

20   only the agreement as a whole. *See Rent-A-Ctr., W., Inc.*, 561 U.S. at 73 (finding that

21   none of opponent's substantive unconscionability challenges were specific to the

22   delegation provision, such as his argument that the agreement's "coverage was one sided

23   in that it required arbitration of claims an employee was likely to bring . . . but did not

24   require arbitration of claims Rent-A-Center was likely to bring," given that such

25   arguments "clearly did not go to the validity of the delegation provision").

26       In sum, the Court finds the Arbitration Agreement's language to clearly and

27   unmistakably illustrate that the parties agreed to delegate threshold issues concerning the

28   Agreement's validity and enforceability to the arbitrator. Additionally, Plaintiff only

challenges the enforceability of the Agreement as a whole. Thus, in accordance with the parties' agreement, the Court must stay the litigation to permit the arbitrator to consider these threshold issues, and then, if permissible, arbitrate the substantive claims.

CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's motion to stay case and compel arbitration. (Doc. No. 10.) The parties are **COMPELLED** to arbitrate Plaintiff's claims in accordance with the Arbitration Agreement. The action is hereby **STAYED** pursuant to 9 U.S.C. § 3 pending arbitration. Defendant is **ORDERED** to file a status report with the Court ***180 days*** after this order's issuance, and every ***180 days*** thereafter, until this matter is no longer stayed.

**IT IS SO ORDERED.**

Dated:  July 7, 2016

Hon. Anthony J. Battaglia
United States District Judge